1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

11 | JARED M. VILLERY,

12 |         Plaintiff,

13 |     v.

14 | JEFFREY BEARD, et al.,

15 |         Defendants.

16

17

18

19

20

21

Case No. 1:15-cv-00987-DAD-BAM (PC)

FINDINGS AND RECOMMENDATIONS REGARDING PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
(Doc. Nos. 62, 78, 99)

ORDER REGARDING DEFENDANTS' MOTION TO STRIKE EVIDENCE IN SUPPORT OF PLAINTIFF'S REPLY
(Doc. Nos. 100, 104, 105)

ORDER REGARDING PLAINTIFF'S MOTIONS RELATED TO REQUEST FOR A PRELIMINARY INJUNCTION
(Doc. No. 86, 91, 102, 110)

**THIRTY-DAY DEADLINE**

22 **I.     Introduction**[1]

23        Plaintiff Jared M. Villery is a state prisoner proceeding *pro se* and *in forma pauperis* in this

24 civil rights action pursuant to 42 U.S.C. § 1983.  This case proceeds on Plaintiff's claim against

25 Defendants Kendall, Acosta, Naficy, Jones, Guerrero, Aithal, Seymour, Carrizales, Woodard,

26 Pallares, Hernandez, Fisher, Grimmig, and Miranda for deliberate indifference in violation of the

27 Eighth Amendment, and against Defendant Diaz based on a policy to deny single cell housing for

28 _____

[1] The page numbers used herein are the CM/ECF page numbers.

1

inmates with serious mental disorders due to overcrowding, in violation of the Eighth Amendment.[2] The case arises out of Plaintiff's allegations concerning allegedly improper housing decisions for Plaintiff, who suffers from Post-Traumatic Stress Disorder ("PTSD").

Currently before the Court are a number of motions related to Plaintiff request for a preliminary injunction directing prison officials to house him in a single occupancy cell, including:

1.    Plaintiff's motion for a preliminary injunction, filed on February 2, 2018 (Doc. No. 62.) On April 5, 2018, Defendants filed an opposition to Plaintiff's motion.  (Doc. No. 78.) Plaintiff filed a reply to Defendants' opposition on August 6, 2018.  (Doc. No. 99.)[3];

2.    Defendants' motion to strike evidence that Plaintiff filed in support of his reply to Defendant's opposition to his motion for a preliminary injunction, filed on August 17, 2018.  (Doc. No. 100.)  Plaintiff filed an opposition to the motion to strike on September 5, 2018.  (Doc. No. 104.)  Defendants filed a reply to that opposition on September 7, 2018.  (Doc. No. 105.);

3.    Plaintiff's motion to file documents under seal, filed on August 27, 2018 (Doc. No. 102); and

4.    Plaintiff's emergency motion for immediate resolution of his motion for preliminary injunction, filed on November 14, 2018.  (Doc. No. 110.)

On August 1, 2018, this matter was set for a settlement conference before the Honorable Erica P. Grosjean, on October 18, 2018.  (Doc. No. 98.)  On September 25, 2018, after both parties informed the Court that the settlement conference would not likely be meaningful based on recent discussions, the Court vacated the conference and set about addressing pending matters in this case. (Doc. No. 109.)  Plaintiff's emergency motion for immediate resolution of his motion for preliminary injunction seeks for his request to be temporarily assigned to the first available judge

---

[2] Effective September 1, 2018, Secretary Diaz has assumed the position as Acting Secretary of the California Department of Corrections and Rehabilitation ("CDCR").  Under Federal Rule of Civil Procedure 25(d), Secretary Diaz should be substituted for former Secretaries Beard and Kernan with respect to Plaintiff's claim for a violation of his rights based on a policy promulgated in the Secretary's official capacity.

[3] Plaintiff filed motions for an extension of time to file a reply, based on the need to conduct additional research and work on the reply brief, which the Court grants *nunc pro tunc*.  (Doc. Nos. 86, 91.)  To the extent that those motions made other requests, they will be separately addressed.

for quicker review. That motion is denied, as the Court is now addressing his request along with all the other related matters.

The rest of the above motions now being ripe for ruling upon, they are deemed submitted. Local Rule 230(l).

## II.     Defendants' Motion to Strike

The Court begins with Defendants' motion to strike, as it impacts the scope of evidence to be considered in evaluating Plaintiff's preliminary injunction request. (Doc. No. 100.)

### A.     Arguments

Plaintiff's motion for a preliminary injunction seeks injunctive relief against the Secretary of CDCR and their subordinates. (Doc. No. 62.) Plaintiff seeks for the Court to direct that Plaintiff be housed in a single occupancy cell for ninety days from the date of any injunction, subject to re-evaluation by the Court for renewal. Plaintiff's motion is lengthy, consisting of over 100 pages of material, including exhibits such as declarations, reports, photographs, and medical notes.

Originally Defendants did not respond to the motion, and therefore the Court ordered a response within twenty-one days, on March 16, 2018. (Doc. No. 71.) Defendants then filed an opposition on April 5, 2018. (Doc. No. 78.)

As noted above, Plaintiff took several months to prepare a reply to Defendants' opposition, and submitted another lengthy document exceeding 100 pages. (Doc. No. 99.) Included among the exhibits is an expert report of Dr. Mariposa McCall, M.D., pursuant to Federal Rule of Civil Procedure 26(a)(2) ("McCall Report"). (*Id*. at Ex. 1.) Also included is a declaration by Abel Campos, dated January 30, 2018 ("Campos Declaration"). (*Id*. at Ex. 7.) These exhibits are the subject of Defendants' motion to strike.[4]

Defendants argue that these exhibits constitute new evidence which was not submitted with Plaintiff's initial motion, and therefore they have not had an opportunity to review and respond to that evidence in their opposition.

---

[4] The McCall Report is referenced, but not actually included, in Plaintiff's Reply, although it was served on Defendants. The McCall Report, along with some other exhibits, were separately submitted to the Court for in camera review in conjunction with a request to file them under seal, as discussed further below. (Doc. No. 102.)

3

1    Plaintiff opposes the motion, raising several arguments, including that this new evidence is

2    merely rebuttal evidence to Defendants' expert opinion declarations by K. Costa ("Costa

3    Declaration") and B. Romano ("Romano Declaration"), CDCR employees, that Defendants

4    submitted with their opposition.  (Costa Decl., Doc. No. 78, Ex. A; Romano Decl., Doc. No. 78, Ex.

5    B.)  He further argues that the McCall Report and Campos Declaration were previously unavailable

6    through no fault of his own, and that striking that evidence now would cause undue delay and

7    prejudice.

8        In reply, Defendants argue that the declarations they submitted are not expert opinions, and,

9    regardless, the McCall Report and Campos Declaration present new evidence submitted to bolster

10   Plaintiff's arguments from his original motion, not to rebut their opposition.  Therefore, they argue

11   that the evidence should be disregarded and stricken from the record.

12   **B.    Analysis**

13       "Generally, 'reply briefs are limited in scope to matters either raised by the opposition or

14   unforeseen at the time of the original motion.'"  *Townsend v. Monster Beverage Corp*., 303 F. Supp.

15   3d 1010, 1027 (C.D. Cal. 2018) (quoting *Burnham v. City of Rohnert Park*, 1992 WL 672965, at *1

16   n. 2 (N.D. Cal. May 18, 1992)).  To the extent that a party raises a new argument or proffers new

17   evidence and information in a reply brief, that argument or evidence is improper because the

18   opposing party is deprived of an opportunity to respond.  *Tovar v. United States Postal Service*, 3

19   F.3d 1271, 1273 n. 3 (9th Cir. 1993).  Therefore, a court cannot consider new evidence provided in

20   a reply when the other party has not had any opportunity to respond to the evidence.  *Provenz v.*

21   *Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  However, where evidence is "submitted in direct

22   response to proof adduced in opposition to a motion" it is not "new."  *Edwards v. Toys "R" Us*, 527

23   F. Supp. 2d 1197, 1205 n.31 (C.D. Cal. 2007) (citing *Terrell v. Contra Costa Cnty*., 232 Fed. Appx.

24   626, 629 n.2 (9th Cir. 2007)).  The Court therefore evaluates whether the McCall Report and

25   Campos Declaration present new evidence, or merely represent rebuttal evidence to Defendants'

26   opposition.

27       Plaintiff's motion for preliminary injunction asserts that double-celling him, rather than

28   designating him for single cell housing, causes him severe psychological distress and has

4

deteriorated his mental and physical health, including sleep deprivation and a negative impact on his day-to-day functioning.  In support of his request for relief, Plaintiff has submitted opinions by mental health professionals, clinical evaluations and testing reports, heath records, cellmate declarations, incident reports, photographs, housing policy documents, and his own declaration. (Exs. in Supp. of Mot. for Prelim. Inj., Doc. No. 62, at 24-139.)  Plaintiff asserts that his PTSD diagnosis has been confirmed since 2007, and that his symptoms are aggravated by being housed with others.

Defendants oppose the motion, arguing in part that Plaintiff had no case factors that precluded him from double-cell or dorm housing, and therefore it did not violate his constitutional rights to house him in those situations.  Defendants further assert that Plaintiff can be successfully housed with other inmates without harm.  In support, Defendants submitted the Costa Declaration, made by K. Costa, a CDCR Correctional Counselor III, (Costa Decl. ¶ 1), and B. Romano, a CDCR clinical psychologist, (Romano Decl. ¶ 1).  Counselor Costa was Chairperson for a Unit Classification Committee ("UCC") hearing for Plaintiff on January 4, 2018, and Dr. Romano participated in Plaintiff's Interdisciplinary Treatment Team ("IDTT") hearing on December 5, 2017. (*Id.*)  Neither Costa nor Romano is a defendant in this action, but they are discussed by Plaintiff in his declaration submitted in support of his motion.

In reply to Defendants' opposition, Plaintiff argues that Counselor Costa and Dr. Romano incorrectly declare that he has been housed with cellmates for years without incident.  In support, Plaintiff cites cellmate declarations submitted with his original motion, from cellmates that he was housed with from 2014 and 2015, as well as the Campos Declaration.  The Campos Declaration is made by prisoner Abel Campos, who declares that he was Plaintiff's cellmate from January 16, 2018 until January 27, 2018.  (Campos Decl. ¶ 1.)  It discusses Campos' experiences living with Plaintiff, and his request to prison officials to put Plaintiff in another cell to avoid an altercation. (*Id.*)

Defendants argue that the Campos Declaration, like the other cellmate declarations that Plaintiff submitted with his original motion, provides additional evidence that demonstrates that Plaintiff decompensates with a cellmate.  Therefore, it should have been submitted with his original

motion so that it could be addressed in the opposition. The Campos Declaration however, as Plaintiff points out, was executed after his motion was provided to prison officials for mailing. In any case, Plaintiff uses the Campos Declaration to rebut Defendants' argument that his central file shows no history of abuse, violence, or victimization with or by cellmates, and that he has been housed with cellmates without incident, such that he is currently able to double-cell without harm. Whereas the other cellmate declarations address an earlier period, the Campos Declaration is used as recent evidence to support Plaintiff's reply that correctional officers separated him from cellmates due to problems that he was having living with a cellmate up to the time of this lawsuit. The Campos Declaration discusses problems that Plaintiff encountered with a cellmate after Dr. Romano's team declined to recommend single-cell status at the IDTT hearing, and after the UCC hearing that Costa oversaw approved Plaintiff for double-cell housing, in part based on the IDTT hearing findings. As discussed in further detail below, Campos declares that Plaintiff was tense, would stay up all night, kept the lights on all night, and would snap at Campos. Campos further declares that he feared an altercation with Plaintiff, and asked to be put in another cell. Thus, Plaintiff uses the Campos Declaration to contradict the declarations of Costa and Dr. Romano by attacking their assertions of a lack of cellmate problems. Therefore, the Court finds it is rebuttal evidence, and Defendants' motion for the Court to disregard and strike it shall be denied.

Next, the Court examines whether the McCall Report is new evidence submitted with Plaintiff's reply. The McCall Report, as noted above, is an expert opinion report by psychiatrist Dr McCall, based on a May 31, 2018 examination of Plaintiff, a review of various records, and on Dr. McCall's medical training and her review of medical literature and resources. The records include the materials that Plaintiff submitted in support of his motion, and other records. (*Compare* Exs. in Supp. of Mot. for Prelim. Inj., Doc. No. 62 at 24-25, *with* McCall Report at 3, List of Materials Reviewed.) The McCall Report provides an assessment of Plaintiff's mental health and opinions about the effect of his housing on his mental health, whether defendants were deliberately indifferent, and what housing would be best for Plaintiff, among other issues. The McCall Report also discusses Dr. McCall's knowledge and experience gained from working for CDCR.

///

1    The Court agrees with Defendants that the McCall Report constitutes new evidence, rather

2    than material submitted merely to rebut matters raised by the opposition.  The McCall Report gives

3    new opinions and findings supporting Plaintiff's request for injunctive relief and addresses new

4    matters outside of the scope of both Plaintiff's motion and Defendants' opposition.

5         Although the Court finds that the McCall Report constitutes new evidence, the Court further

6    finds that it does not materially alter the findings and recommendations that the Court will make

7    regarding Plaintiff's motion, detailed below.  Therefore, although the Court finds that the McCall

8    Report cannot be considered without allowing Defendants an opportunity to reply to the evidence, it

9    will exercise its discretion not to strike the evidence.  The Court also does not find it necessary to

10   delay the proceedings for any surreply by Defendants before evaluating Plaintiff's request for a

11   preliminary injunction, particularly since the Court shall decline to consider the McCall Report.

12        Accordingly, Defendants' motion to strike the McCall Report will be denied.  The Court

13   will only decline to consider it in making these findings and recommendations, but will not strike

14   the evidence from the record.

15   **III.    Plaintiff's Motion to File Documents Under Seal**

16        Next, Plaintiff has also filed a motion to file the McCall Report and certain other documents

17   submitted as exhibits to his reply in support of his motion for preliminary injunction, under seal.

18   (Doc. No. 102.)  The parties have also entered into a stipulated protective order.  (Doc. No. 39.)

19        "Historically, courts have recognized a 'general right to inspect and copy public records and

20   documents, including judicial records and documents.'"  *Kamakana v. City & Cty. of Honolulu*, 447

21   F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7

22   (1978)).  "[J]udicial records are public documents almost by definition, and the public is entitled to

23   access by default."  *Id.* at 1180.  This "federal common law right of access" to court documents

24   generally extends to "all information filed with the court," and "creates a strong presumption in

25   favor of access to judicial documents which can be overcome only by showing sufficiently

26   important countervailing interests."  *Phillips ex. Rel. Estates of Byrd v. Gen. Motors Corp.*, 307

27   F.3d 1206, 1212 (9th Cir. 2002) (citations and quotation marks omitted).

28   ///

Two standards govern whether documents should be sealed: a "compelling reasons" standard, which applies to dispositive motions, and a "good cause" standard, which applies to non-dispositive discovery type motions. *Kamakana*, 447 F.3d at 1179; *see also Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010). The "good cause" standard, which is applicable here, presents a lower burden for the party wishing to seal documents. *Pintos*, 605 F.3d at 678. Courts determine whether good cause exists to protect the information from being disclosed to the public by "balancing the needs for discovery against the need for confidentiality." *Id.* (quoting *Phillips*, 307 F.3d at 1213).

Plaintiff contends that most of the documents submitted under seal contain confidential medical information that is protected by disclosure under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), and is subject to the protective order in this action. One of the documents is a confidential report containing information protected by CDCR's official information privilege that is also the subject of a protective order in another action, *Villery v. Garcil, et al.*, No. 1:15-cv-00936-LJO-SAB (E.D. Cal.).

Having considered the documents at issue, which contain confidential health information and confidential investigatory information obtained from witness interviews, and in the absence of any objection, the Court concludes that Plaintiff has sufficiently shown good cause for filing the documents under seal. Therefore, his request to file these documents under seal is granted.

Pursuant to Local Rule 141(e)(2)(ii), the Court will transmit to the Clerk the documents to be sealed along with the order authorizing sealing. The Clerk will scan the documents to be sealed and file them under seal. The Clerk will then return the documents to Plaintiff, the submitting party.

**IV.   Plaintiff's Motion for Preliminary Injunction**

Finally, the Court turns to Plaintiff's request for a preliminary injunction, beginning with the facts derived from the evidence considered in evaluating Plaintiff's request.

A motion for preliminary injunction must be supported by "[e]vidence that goes beyond the unverified allegations of the pleadings." *Fidelity Nat. Title Ins. Co. v. Castle*, No. C-11-00896-SI, 2011 WL 5882878, *3 (N.D.Cal. Nov. 23, 2011) (citing 9 Wright & Miller, <u>Federal Practice &</u>

Procedure § 2949 (2011)). The plaintiff, as the moving party, bears the burden of establishing the merits of his or her claims. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). However, evidence in support of a preliminary injunction application need not meet normal evidentiary standards, and the court may consider and give weight to inadmissible evidence in considering preliminary relief. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003); *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). *See also Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination ... The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *Ross–Whitney Corp. v. Smith Kline & French Laboratories*, 207 F.2d 190, 198 (9th Cir. 1953) (holding preliminary injunction may be granted on affidavits).

## A. Facts[5]

### 1. Plaintiff's Background and Condition

Plaintiff is a 34-year-old male who is currently serving a 28-year and 4-month sentence for a conviction of robbery, attempted robbery, burglary and false imprisonment. (Aug. 24, 2017 Psychological Assessment Report ("8/24/17 Report"), Doc. No. 62, Ex. E, at 72.) He has a history of depression, antisocial behavior, and marijuana usage prior to his imprisonment, but also had a good childhood and did not witness or experience domestic violence or abuse. (*Id.* at 73-74.) However, Plaintiff had difficulties and was bullied in his youth for growing up poor, and ended up selling drugs and robbing drug dealers, leading to the incident that he is imprisoned for what he committed at age 18. (*Id.*) Plaintiff was arrested on August 31, 2003, at age 19, and held in Los Angeles County custody at the Twin Towers Correctional Facility for about two years. (First Am Compl., Doc. No. 22, ¶ 32.) Following his conviction, Plaintiff entered CDCR's custody on July 19, 2005, at the age of 21. (*Id.* at ¶ 33; 8/24/17 Report at 74.)

---

[5] As noted above, Plaintiff has submitted certain materials for filing under seal, which request is being granted here. Defendants have also filed materials under seal pursuant to the protective order in this case. The Court has not detailed any of those materials in this order and findings and recommendations, and only cites public filings. However, the Court notes that Plaintiff has publicly filed documents which appear to contain the same or similar information to that which has been filed under seal.

Plaintiff identifies as being of mixed-race heritage, as his dad is Creole. (8/24/17 Report at 74.) He was categorized by CDCR as "White," despite his self-identification as mixed-race. (*Id*.) Plaintiff would "hang out" with Black prisoners, as he identified with them. (*Id*.) After being in prison for a few years, he was housed at Kern Valley State Prison, and his socializing with Black prisoners was seen as a "betrayal" to White gang member prisoners. (*Id*.) Plaintiff also asserts that he witnessed numerous assaults, stabbings, murders, and the results of suicides while at Kern Valley State Prison. (First Am. Compl. ¶ 33.)

In 2007, while Plaintiff was walking across the yard to his housing unit, Plaintiff was attacked by two White gang member inmates and stabbed in the back with a 10-inch knife, approximately a quarter inch from his spine, which penetrated his body about 1 to 1-1/2 inches. (8/24/2017 Report at 74; *see also* June 28, 2016 Psychological Testing Report ("6/28/16 Report"), Doc. No. 62, Ex. C, at 60.) Plaintiff fought off his attackers, and correctional officers quickly pepper-sprayed Plaintiff and the two assailants to address the situation. (*Id*.) Plaintiff found this life-threatening event traumatic, stating that he "realized [his] mortality that day." (*Id*.) Plaintiff also described the incident as a "real wake-up call" and says that he is "a completely different person now." (8/24/17 Report, at 74.) Plaintiff developed PTSD from the incident.

Following the attempt on his life, Plaintiff was housed in Administrative Segregation, in a single cell, for over seven months, for the safety of himself and other inmates. (First Am. Compl. ¶ 34.) Plaintiff was also reclassified into the Sensitive Needs Program ("SNY"). (*Id*.)

Plaintiff contends that he has been unable to live with a cellmate ever since his stabbing. (8/24/17 Report, at 74.) Following the initial traumatic event, he has had repeated detrimental re-exposures to aspects of that event, witnessing assaults frequently in the prison setting. (*Id*.)

Plaintiff received a Rules Violation Report ("RVR") for fighting with another inmate, named Robinson, on December 15, 2015. (12/15/2015 Incident Report, Doc. No. 62, Ex. B, at 49-50.) Both inmates were injured, and Plaintiff had bruises, swelling, scratches and abrasions, cuts, and a broken ankle. (*Id*.; see also Photos of Injuries, *id*. at 51-56.) Plaintiff pleaded not guilty to the fighting charge, asserting that he was injured in a fall, and there was no statement from Inmate Robinson. (RVR E-15-12-024, Doc. No. 78, Ex. C.) Nevertheless, Plaintiff was found guilty of

fighting based on evidence that a confidential source saw him swing at or hit another inmate, among other evidence.  (*Id*.)

Now, Plaintiff asserts that he was sleep-deprived due to PTSD-symptom related problems with his cellmate at the time, causing him to be more on edge and anxious than usual.  (First Am. Compl. ¶¶ 71-73.)  On December 15, 2015, Plaintiff had been in an altercation earlier in the day with his cellmate, Inmate Sweis, and when Plaintiff was standing in his cell afterwards, Inmate Robinson bumped into his cell door.  (*Id*.)  Plaintiff rushed to the door and, thinking that Inmate Robison was attempting to sneak up and attack him, shoved Inmate Robison, starting a fight.  (*Id*.)  Plaintiff asserts that he told staff he was injured in a fall in fear of being punished and due to confusion, but later properly informed staff that he was injured during an altercation with another inmate that resulted from his PTSD symptoms.  (Pl.'s Reply, Doc. No. 99, at 12; 5/11/16 CDCR Form 602, Doc. No. 99, Ex. 5, at 58-59.)

### 2.  Psychological Treatment, Testing and Symptoms

On March 30, 2016, Plaintiff was seen by psychologist Dr. Riffle, who discussed a pending mental health evaluation and processing of a permanent single cell chrono for Plaintiff.  (3/30/26 Psych. Progress Note, Doc. No. 62, Ex. E, at 79.)  Plaintiff reported fearing that if he was in dorm housing, he will either kill someone or be killed.  (*Id*.)  Plaintiff was also exhibiting extreme hypervigilance and was not sleeping.  (*Id*.)  Dr. Riffle recommended a temporary single-cell chrono for continued evaluation and a follow-up.  (*Id*.)

Plaintiff received a battery of psychological tests on April 6 and April 7, 2016.  (6/28/16 Report, at 60.)  These tests included the Clinician Administered PTSD Scale for DSM-5 ("CAPS-5"), the "gold standard" for a PTSD assessment.  (*Id*.)  The testing indicated that Plaintiff had been exposed to an actual threatened death, had four of five intrusion symptoms of PTSD, and both symptoms of persistent avoidance of stimuli.  (*Id*.)  Plaintiff also showed five of the seven symptoms of negative alterations in cognitions and mood, and four out of six symptoms of marked alterations in arousal and reactivity.  (*Id*.)  Plaintiff reported the same frequency, intensity, and severity of symptoms starting from two months following the trauma incident, and continuing for over 102 months at the time of the test.  (*Id*.)  The tests showed that Plaintiff had significant distress

or impairment in social, occupational, or other important areas of functioning.  (*Id*.)  The PTSD diagnosis was clearly met, and a significant level of symptom severity was indicated.  (*Id*.)

According to the testing, Plaintiff experienced involuntary memories and intrusive thoughts or thinking about the incident, with moderate frequency and severity.  (*Id*. at 61.)  Plaintiff also had intense and frightening dreams, causing problems with sleep, and this symptom was extreme in both severity and frequency.  (*Id*.)  Plaintiff also experienced distress at being reminded of the traumatic event, which was moderate in both frequency and severity.  (*Id*.)

Plaintiff was making extreme efforts to avoid distressing memories or thoughts of the trauma, including isolating and distracting himself, and it presented a significant life disturbance.  (*Id*. at 62.)  This symptom was extreme in both frequency and severity, being incapacitating on an everyday basis.  (*Id*.)  Plaintiff also avoided external reminders of the event by minimizing his contact with others, and stated that he would not be able to handle a dormitory setting.  (*Id*.)  Plaintiff was willing to risk disciplinary action to avoid reminders or triggers of the events.  (*Id*. at 63.)  This symptom was also extreme in severity and frequency.  (*Id*.)

Plaintiff endorsed a strong, persistent, and exaggerated negative set of beliefs about other people and his environment, and was mistrustful of staff, believing that they put him in a "bad spot" with his classification and made him unsafe.  (*Id*.)  Plaintiff also felt that the other inmates are "all dirt bags."  (*Id*.)  Plaintiff denied having these views prior to being attacked, saying that he used to trust people and could socialize—even in prison—prior to the attack.  (*Id*.)  This symptom was severe in severity and extreme in frequency.  (*Id*. at 64.)  Plaintiff also experienced a persistent negative emotional state, experiencing both fear and anger 80% of the time, which is severe. (*Id*.)

Plaintiff had a markedly diminished interest and willingness to participate in activities due to the traumatic event, now being unable to play sports and socialize with people, and instead occupying his time with solitary and isolating activities, such as reading, studying, and work.  (*Id*.)  This symptom was severe in frequency and severity.  (*Id*.)  Plaintiff also reported feeling distant and cut off from other people, especially fellow inmates and staff, which was very strong and troubling.  (*Id*. at 65.)  With respect to inmates and staff, this symptom was severe.  (*Id*.)

///

12

Plaintiff reported difficulty experiencing positive emotions, which was found to be moderate in severity and frequency. (*Id.*) Plaintiff further reported several angry outbursts with minimal to no provocation, including a then-recent incident of internalized feelings of fear related to a committee action and potentially being moved, causing an outburst. (*Id.*) Plaintiff also reported an increase in risky behavior that might cause him harm. (*Id.*)

Plaintiff reported hypervigilance, including being on guard, watchful, and wary 100% of the time outside of his cell, constantly watching everyone, feeling in danger all the time, and being exhausted as a result. (*Id.* at 66.) This symptom was found to be extreme in severity and frequency. (*Id.*) Plaintiff also reported an extreme startle response, and that over the past several years he had multiple in-cell fights or near-fights with his cellmates due to being startled. (*Id.*) Plaintiff reported that he had an incident where an inmate bumped into a door, hitting Plaintiff in the back, and he reacted by hitting the inmate. (*Id.*) Because the incidents that Plaintiff discussed were generally not reported to custody or documented, they were difficult for the psychiatrist to fully validate. (*Id.*) Nevertheless, the symptom was rated extreme in severity and severe in frequency. (*Id.*) Plaintiff also reported moderate sleep disturbance, including difficulty falling asleep and staying asleep, with moderate frequency. (*Id.* at 67.)

Other testing that Plaintiff underwent included a Trauma Symptom Inventory Version 2 ("TSI-2"), a widely used test of trauma-related symptoms and behaviors, which is also administered as a second measure to compare with the CAPS-5 results. (*Id.* at 68.) That test showed significant findings of anxiety and hyperarousal, anger, intrusive experiences, relational avoidance, posttraumatic stress and tension reduction, all correlating well with the CAPS-5 findings and highly consistent with a diagnosis of PTSD. (*Id.*) The two validity scores indicated a valid profile for Plaintiff. (*Id.*)

Plaintiff also underwent the Miller Forensic Assessment of Symptoms Test ("M-FAST") to assess the likelihood of feigning psychiatric illness, a measure that has been validated with the prison population. (*Id.* at 68.) The TSI-2 is also compared with the data obtained from the CAPS-5. (*Id.*) Out of the twenty-five measured items, Plaintiff had results for a rare combination of symptoms, giving him a score of 1/25. (*Id.*) Malingering is considered likely with scores of 6/25 or

higher, and thus the testing result indicated that Plaintiff did not appear to be malingering mental illness. (*Id*.)

Plaintiff also underwent the Minnesota Multiphasic Personality Inventory-2, Restructured Form ("MMPI-2 RF), a self-report measuring psychopathology and personality. (*Id*.) Of some clinical significance was that Plaintiff had a larger than average number of infrequent responses and rare symptomology, which can occur in individuals with genuine, severe, or can be a sign of symptom overreporting. (*Id*.) The psychiatrist evaluating Plaintiff's test results found that Plaintiff reported credible and severe psychopathology consistent with his overall profile across multiple instruments, and therefore did not find that he was overreporting. (*Id*. at 68-69.) The psychiatrist found that Plaintiff showed significant emotional distress and anxiousness, with significant anxiety, and that he is very likely to be stress-reactive, worry-prone, and anger-prone. (*Id*. at 69.) The psychiatrist also found that Plaintiff had thought dysfunctions, including persecutory ideation, and is very likely to be suspicious, distrustful, and to experience serious interpersonal difficulties. (*Id*.) Plaintiff's profile was found to be valid and consistent with a PTSD diagnosis. (*Id*.)

Overall, the testing battery showed a consistent profile across multiple instruments for Plaintiff, and he received a diagnosis of PTSD with an ongoing level of significant symptom severity. (*Id*. at 70.) Plaintiff was also diagnosed with Antisocial Personality Disorder. (*Id*.)

From about April 2016 through June 2016, Plaintiff had been housed on a temporary single cell status for three months at the California Substance Abuse Treatment Facility ("CSATF") based on a mental health recommendation by Dr. Riffle. (Pl.'s 1/25/18 Decl., Doc. No. 62, Ex. I, at ¶ 2.) Dr. Riffle maintained the recommendation for months, despite significant pushback from Defendants Fisher and Miranda. (*Id*. at ¶ 3.)

However, Dr. Riffle was forced to rescind the recommendation on January 31, 2017, due to pressure from Defendant Miranda and an order from the Chief of Mental Health at CSATF. (*Id*.) On February 23, 2017, the UCC removed Plaintiff's single cell status, and Plaintiff was moved to dorm style housing, which caused him to "go into a psychological tail-spin." (*Id*. at ¶ 6.)

///

///

Plaintiff subsequently decompensated to the point that he was placed in a Mental Health Crisis Bed ("MHCB"), where he was placed in a single cell, and he began engaging in hunger strikes to bring attention to his housing situation and treatment concerns. (*Id.* at ¶ 7.)

Progress notes throughout February 2017 continued to discuss Plaintiff's concerns regarding the denial of single cell status, and Plaintiff' anger, stress, anxiety, worry, and lack of sleep resulting from his PTSD symptoms. (2/2017 Progress Notes, Doc. No. 62, Ex. F, at 104-06.) Plaintiff was recommended calming, relaxation, and anger management techniques, but it was found that he had a poor ability or willingness to use coping skills. (*Id.*) Plaintiff was also again engaging in hunger strikes. (*Id.*)

Plaintiff was retained in MHCB for fifty days, and then was transferred to the Department of State Hospitals ("DSH") for treatment on April 13, 2017, where he was housed in a single cell. (*Id.* at ¶ 8.) A progress note from April 14, 2017 discussed Plaintiff's continued depression and anxiety primarily related to losing his single cell status chrono, and the potential that Plaintiff sought MHCB and DSH admission to avoid being housed with a cellmate. (4/14/17 Progress Note, Doc. No. 62, Ex. F., at 107-08.) The report further noted concerns that Plaintiff could become very anxious and distressed if forced to live with a cellmate, and might cause injury to himself without intending to, or could "up the ante" to retain single cell status. (*Id.*)

A May 18, 2017 progress note indicated that Plaintiff had been placed on DPS status after he reportedly sent in a form indicating that he would harm general population inmates if he were housed or celled with them. (5/18/17 Service Note, Doc. No. 62, Ex. F., at 109.) The psychologist found similar corroborating statements in Plaintiff's records and evaluations, but that a special IDTT recommended that his single cell status be removed on May 18, 2017, because Plaintiff had denied hostile intentions towards staff and other inmates. (*Id.*) The psychologist noted that while Plaintiff was on DPS status, his symptoms decreased, he was voluntary taking medications, and Plaintiff reported feeling safe and sleeping well. (*Id.*) However, Plaintiff's risk for violence and harm could increase if he was placed in a dorm setting or with general population inmates, as this is a trigger for Plaintiff's PTSD. (*Id.*) Later progress notes were consistent with these findings, and recommended continued monitoring and assessments of Plaintiff's conditions for signs of acute

distress, anxiety, or depression.  (6/28/17 Note, Doc. No. 62, Ex. F, at 111; 8/2017 Notes, *id*. at 114; 8/23/17 Note, *id*. at 115.)

On August 2, 2017, Plaintiff was evaluated due to depression and anxiety related to recently losing his single cell status chrono.  (8/2/17 DSH Psych. Discharge Summary, Doc. No. 62, Ex. E, at 81.)  Plaintiff had refused to program with general population inmates due to safety concerns.  (*Id*.)  Plaintiff requested a referral for single cell status.  (*Id*.)  The psychiatrist, Dr. Brar, recommended that Plaintiff be considered for single cell status due to his PTSD.  (*Id*. at 82.)

Plaintiff's Mental Health Treatment Plan from August 23, 2017, at CSATF, noted Plaintiff had been diagnosed with PTSD and had participated well in treatment, with improved symptoms.  (8/23/17 Plan, Doc. No. 62, Ex. G, at 117-19.)  Plaintiff was set for an IDTT and sought single cell status.  (*Id*.)  The matter was referred to mental health headquarters in Sacramento, and it was recommended that housing is a custody issue to be resolved with custody.  (*Id*.)

Later, Plaintiff underwent additional psychological testing by a psychologist in June 2017, who prepared an assessment report, dated August 24, 2017.  (8/24/2017 Report at 72-77.)  Plaintiff was referred for the assessment by his treatment team to assess how his PTSD symptoms were then impacting his ability to function, and to make recommendations to manage his symptoms.  (*Id*. at 72.)  Plaintiff underwent the M-FAST and MMPI-2 RF again, as well as the Wide Range Achievement Test, 4th Edition; the Thematic Apperception Test; the Rorschach Performance Assessment System; and the Wechsler Abbreviated Scale of Intelligence, 2nd Edition.  (*Id*. at 73.)

Plaintiff again reported developing PTSD from his 2007 stabbing, and that he has been unable to live with a cellmate ever since.  (*Id*. at 74.)  Plaintiff also continued to experience nightmares from the trauma, and is unable to sleep through the night due to fear of being stabbed, unless single-celled.  (*Id*.)

The psychologist made a behavioral assessment of Plaintiff, finding that his mood was mostly calm but occasionally anxious, and that his thought content tended to focus on his eventual discharge and his concerns about receiving single cell housing status.  He appeared to be giving his best efforts during testing.  (*Id*.)

///

16

From the MMPI-2 RF, the psychologist found that Plaintiff was responding consistently, and that the M-FAST showed that he was being truthful, and not attempting to exaggerate symptoms or endorse symptoms that he did not have.  (*Id*. at 75.)  Plaintiff's cognitive testing showed that his intellectual functioning is superior for his age, and his academic skills are consistent with his abilities.  (*Id*.)  Although Plaintiff did not show any thought disorder or psychosis, he did show a preoccupation with morbid and aggressive imagery, which reflects violence and traumatic experiences and a likelihood of feeling damaged and angry because of experiencing trauma.  (*Id*.)

Plaintiff's test results suggested that he was experiencing high levels of anxiety and anger, likely due to his history of trauma and perceived need for hypervigilance.  (*Id*.)  The psychologist also found that Plaintiff's coping strategy was self-protective defensiveness.  (*Id*.)  Plaintiff tends to gauge people in terms of either their potential use to him, or threat to him.  (*Id*. at 76.)  Considering that he has been in a correctional setting for his entire adult life, his self-preservation mode was not surprising to the psychologist.  (*Id*.)  The psychologist also found that it would be helpful to Plaintiff if he was able to learn how to deal with people cooperatively rather than defensively, but that Plaintiff is very defensive and ready to attack if he perceives any threat.  (*Id*.)

Overall, the psychologist found that Plaintiff developed antisocial traits from childhood resulting in negative events leading to his imprisonment, and that while in prison, Plaintiff developed a defensive automatic mode of self-preservation that has enabled him to survive.  (*Id*.)  His defensiveness has also prevented him from developing interpersonal relationships.  (*Id*.)  Plaintiff met the criteria for PTSD, and has a persistent need to avoid other people, has persistent negative beliefs, and demonstrated marked alterations in arousal and reactivity associated with his traumatic event, including irritable behavior, angry outbursts, and sleep disturbance.  (*Id*.)  Plaintiff also met the criteria for Antisocial Personality Disorder, with narcissistic traits.  (*Id*.)

The psychologist recommended that Plaintiff receive mental health services, including treatment groups with other SNY (as opposed to general population) inmates so that he can focus on his recovery rather than his safety.  (*Id*.)  The psychologist also found that Plaintiff would benefit from a therapeutic approach to work on strengthening his relationships, and that he remain busy and active in the prison setting, including through EOP treatment and continuing in college courses.

(*Id.*)  Finally, the psychologist found that Plaintiff would benefit from single cell status.  (*Id.*)

Although Plaintiff was given the recommendation for single-cell housing status, he was placed in a dorm setting, and began refusing meals in protest, citing his fear of being assaulted and his PTSD.  (8/29/2017 Progress Note, Doc No. 62, Ex. E, at 85-87.)  On August 30, 2017, after being told that he would be granted temporary single-cell status, Plaintiff agreed to eat.  (8/30/17 Progress Note, Doc. No. 62, Ex. E, at 89.)  Plaintiff's single cell stats was officially reinstated on September 13, 2017.  (Pl.'s 1.25/18 Decl. ¶ 12.)

By October 2017, Plaintiff was placed at Mule Creek State Prison, where staff disregarded the previous recommendations that Plaintiff have single cell status.  (*Id.* at ¶13; 11/13/17 Assessment, Doc. No. 62, Ex. E, at 100.)  In a Master Treatment Plan entered on November 7, 2017, Plaintiff was found to have poor social skills related to dorm living, and group therapy was recommended to increase his functioning and social engagement.  (11/7/17 Plan, Doc. No. 62, Ex. H, at 121-26.)  Plaintiff had not been attending scheduled groups because he thought them unhelpful.  (*Id.*)  It was also noted that Plaintiff was on a hunger strike to preserve his single cell status.  (*Id.*)

On November 9, 2017, Plaintiff was treated again for a hunger strike related to being taken out of single-cell housing into double-cell housing, and Plaintiff complained of extreme PTSD and threats to his safety.  (11/9/17 Progress Note, Doc. No. 62, Ex. E, at 98.)  Plaintiff had lost 26 pounds due to hunger strikes.  (*Id.*)  Plaintiff stated that he was terrified of going back into a double cell.  (*Id.*)  The social worker who evaluated Plaintiff noted that he is repeatedly placed in single cell housing but is then placed in double cell housing when he is moved to a different institution, and the problem seemed to be caused by lack of communication.  (*Id.* at 98-99.)

On November 13, 2017, Plaintiff was evaluated by a mental health clinician and staff psychiatrist, Dr. Sanchez and Dr. Maddox, who noted that Plaintiff had recently undergone testing and that the well-qualified mental health staff found that he suffered from PTSD of a degree that warrants treatment, including single cell housing status.  (11/13/17 Assessment.)  The assessment discusses that Plaintiff had been on hunger strikes because prison officials failed to grant him the treatment indicated for his PTSD, including single cell housing.  (*Id.*)  The assessment further noted

that another professional had also noted problems of communications between the institutions that was resulting in the lack of care, and that there was ample clinical evidence of severe PTSD symptoms and a history warranting single cell housing. (*Id*.) Custody had also previously endorsed an override of Plaintiff's SNY status to house him in a single cell. (*Id*.) Both medical professionals found that an extensive review of Plaintiff's history, face-to-face evaluations, discussions with staff, and Plaintiff's records supported that Plaintiff should be provided with PTSD-specific treatment, including single cell status, as recommended by multiple health care providers. (*Id*.) On November 30, 2017, Plaintiff was placed on temporary single cell housing, pending review. (Pl.'s 1/25/18 Decl. ¶ 17.)

Plaintiff had an IDTT hearing on December 5, 2017, at which it was determined not to recommend single cell status. (*Id*. at ¶ 18.) After the hearing, Plaintiff submitted letters and requests to staff explaining his past in-cell problems in detail, and stating that his safety was endangered by removing his single cell status. (*Id*. at ¶¶ 18-19.) Medical notes from December 4, 2017 and December 13, 2017 continue to discuss Plaintiff's request for single cell status, and his nightmares and anxiety over losing single cell status. (12/4/17 Progress Note, Doc. No. 62, Ex. E, at 101; 12/13/17 Progress Note, *id* at Ex. E, at 102.) Plaintiff was recommended single cell with a time limitation due to his anxiety and fear, pending his appeal of the IDTT decision not to recommend single cell status. (*Id*.)

On January 4, 2018, Plaintiff was taken to a UCC, where his single cell status was denied, and he was placed for transfer to dorm housing. (Pl.'s 1/25/18 Decl. ¶ 19.) Plaintiff declares that his condition continued to dramatically deteriorate, and he was repeatedly separated from cellmates due to significant conflicts resulting from his PTSD symptoms. (Pl.'s 7/31/18 Decl., Doc. No. 99, Ex. 2, at ¶ 2-3.) On February 28, 2018, Plaintiff was transferred to North Kern State Prison ("NKSP"), where he was placed in lay-over housing by himself, until he was transferred to California Correctional Institution ("CCI") on March 2, 2018. (*Id*. at ¶ 4.) Upon Plaintiff's arrival at CCI, he was placed in open air, 200-man dormitory housing, which led to rapid decompensation. (*Id*.) Plaintiff hardly slept, felt paranoid and anxious, and attempted to be placed in MHCB. (*Id*. at ¶¶ 4-5.) For safety concerns related to threats against him by CCI officers, Plaintiff was placed in

Administrative Segregation on March 6, 2018, in a single cell, and was transferred to Valley State Prison ("VSP") on March 16, 2018.  (*Id.* at ¶ 6.)

At VSP, Plaintiff was placed in a dorm with five other inmates, and again experienced a worsening of his PTSD symptoms and a decline in his ability to function.  (*Id.* at ¶ 8.)  Plaintiff had little sleep and was on edge.  (*Id.*)

In June 2018, Plaintiff underwent housing transfers because he was needed as a witness in a criminal matter in Kern County Superior Court, and he was housed in a cell alone for nineteen days.  (*Id.* at ¶ 9.)  During this period, Plaintiff's condition improved, and he was able to use his BiPap machine for his obstructive sleep apnea.  (*Id.*)  Plaintiff also slept without fear of being attacked.  (*Id.*)  In June and July 2018, Plaintiff again was housed with other cellmates, worsening his PTSD symptoms, causing him to experience sleep deprivation, and leading to near altercations with the other inmates, as he repeatedly came close to attacking them over perceived threats.  (*Id.* at ¶¶ 10-12.)

### 3. Plaintiff's Cellmates

Plaintiff had at least twenty-eight cellmates between March 6, 2008 and December 15, 2015.  (List of Cellmates, Doc. No. 99, Ex. 6.)  He also frequently lived alone for days, weeks, or months at a time due to problems with cellmates, despite not being on single-cell status, from July 15, 2013 through November 28, 2015.  (*Id.*)  At these times, housing staff prevent other inmates from being housed with Plaintiff as much as possible.  The total period of being housed alone during this time was 359 days.  (*Id.*)  Ten of Plaintiff's cellmates submitted declarations about being housed with Plaintiff, which are summarized below.

From January 22, 2014 until May 2, 2014, Plaintiff was celled with Brent Walkins while housed at CCI.  (Walkins Decl., Doc. No. 62, Ex. A at 27-28.)  Inmate Walkins describes the few months living with Plaintiff as "the worst time I've spent since getting locked up."  (*Id.* at ¶ 2.)  Inmate Walkins declares that Plaintiff told him that he had problems living with people, and that Walkins should not get too close or move to fast around him, and should stay on his bunk and let Plaintiff know if he was getting down from his top bunk.  (*Id.*)  Inmate Walkins had difficulties complying, which resulted in Plaintiff "freak[ing] out" and accusing Walkins of planning to attack

him, and squaring up to fight. (*Id*. at ¶ 3.) Plaintiff and Inmate Walkins came close to getting into fights many times, but staff refused to move Walkins. (*Id*. at ¶ 4.) Inmate Walkins also observed that Plaintiff did not sleep when he was awake, and that Plaintiff would jump up and get close to fighting Walkins if he got up to use the restroom during the night. (*Id*. at ¶ 5.) Due to Plaintiff's nervousness and Inmate Walkins' fear, Walkins was finally able to move to another cell. (*Id*. at ¶¶ 6-7.)

From June 6, 2014 through June 17, 2014, Plaintiff was celled at CCI with Charlie O'Conner. (O'Conner Decl., Doc. No. 62, at 29-30.) Plaintiff told Inmate O'Conner that due to being stabbed by White boys when he was in general population and being half-Black, he was not comfortable living with people, and especially a White ex-skinhead cellmate. (*Id*. at ¶ 2.) Plaintiff also warned Inmate O'Conner against sudden movements, walking around the cell, or standing too close to Plaintiff. (*Id*.) Although Inmate O'Conner stayed on his bunk and slept a lot, he almost "got into it" with Plaintiff a few times when getting off his bunk. (*Id*. at ¶ 3.) Inmate O'Conner also declares that he "never lived in the cell with someone so paranoid" as Plaintiff, and that he never saw Plaintiff lay down while O'Conner was awake. (*Id*. at ¶ 5.) Since Inmate O'Conner "couldn't live in the cell with someone who was always on edge [and who] thought that every movement [he] made was meant to attack him[,]" O'Conner moved out as soon as possible. (*Id*.)

On June 26, 2014, Plaintiff submitted a CDCR Form 22 stating that he had informed housing staff on multiple occasions that his cellmate and he had numerous instances of near violence due to both of their mental health issues. (6/26/14 Form 22, Doc. No 62, at 31.) His request was partially granted, and Plaintiff was provided a cell move on June 28, 2014. (*Id*.)

From June 28, 2014 through July 3, 2014, Plaintiff was celled at CCI with Da'Saun Roberts. (Roberts Decl., Doc. No. 62, at 32-33.) Plaintiff informed Inmate Roberts of his history of difficulties living with cellmates, and warned Roberts to stay on his bed. (*Id*. at ¶¶ 2-3.) Inmate Roberts agreed to try and stay on his bed and let Plaintiff know when he needed to get down, but they had problems and "almost came to blows a bunch of times[.]" (*Id*. at ¶ 4.) At night a couple of times, when Inmate Roberts got out of bed, Plaintiff hopped up from what appeared to be a dead sleep and confronted Roberts, accusing him of planning to punch him. (*Id*. at ¶ 5.) As a result of

these near incidents, both Plaintiff and Inmate Roberts agreed that Plaintiff needed a cell move, and he was moved after they only lived together for six days. (*Id*. at ¶¶ 5-6.)

On January 9, 2015, Plaintiff was transferred to CSATF, on the same day that Travis Harp-Webb arrived at CSATF. (Harp-Webb Decl., Doc. No. 62, at 34.) They were housed together from January 9, 2015 until February 5, 2015. (*Id*. at ¶ 2.) Inmate Harp-Webb declares that he and Plaintiff got along well, but Plaintiff did not like Harp-Webb walking around his cell or coming off of his top bunk, due to Plaintiff's stabbing incident and because having people close to Plaintiff bothered him. (*Id*. at ¶ 3.) These problems worsened with time, and Plaintiff jumped up and squared off and confronted Inmate Harp-Webb a few times, accusing him of coming after Plaintiff or sneaking up on him. (*Id*. at ¶¶ 5-6.) Plaintiff also hardly slept, and on many occasions they almost got into fights. (*Id*. at ¶¶ 6-7.) Inmate Harp-Webb tired of the incidents with Plaintiff and feared trouble, and therefore moved cells the day after his orientation period ended. (*Id*. at ¶7.)

From February 8, 2015 until April 25, 2015, Plaintiff was celled with Arturo Palomo at CSATF. (Palomo Decl., Doc. No. 62, at 36.) Inmate Palomo declares that he observed Plaintiff had trouble with the presence of someone in a cell with him, seemed paranoid, and that he was uncomfortable around Palomo. (*Id*. at ¶¶ 2-3.) Inmate Palomo observed Plaintiff tense up every time Palomo got off his bunk, and once when he grabbed his razor to shave, Plaintiff jumped out of bed and asked Palomo what he was doing. (*Id*.) Inmate Palomo observed that Plaintiff seemed to sleep very little, and jumped at any noise and whenever the cell door opened, overreacting and making Palomo uncomfortable. (*Id*. at ¶¶ 3-4.) Inmate Palomo feared being attacked if he moved wrong around Plaintiff, and by the end of April felt too threatened to live with Plaintiff any longer, which he told Plaintiff. (*Id*. at ¶¶ 4-5.) Plaintiff then had himself moved to another building. (*Id*.)

From April 25, 2015 until April 30, 2015, Plaintiff was celled with Randy Gilbertson at CSATF. (Gilbertson Decl., Doc. No. 62, at 38-39.) Inmate Gilbertson found that things were immediately bad, as Plaintiff was angry when he first met Gilbertson. (*Id*. at ¶ 2.) Plaintiff told Inmate Gilbertson that he could not jump from his bunk, and that he had problems living with people. Inmate Gilbertson asked to sit on Plaintiff's bed as a friendly gesture, but Plaintiff "flipped his lid saying he doesn't like people sitting close to him." (*Id*. at ¶ 3.) Inmate Gilbertson described

the atmosphere living with Plaintiff as "super serious[,] like walking on eggshells." (*Id*.)

After a couple of days, Inmate Gilbertson and Plaintiff talked and Gilbertson thought things had improved, so he patted Plaintiff on the back. (*Id*. at ¶ 4.) Plaintiff "wigged out" and pushed Inmate Gilbertson, and Gilbertson thought they were going to fight. (*Id*.) Inmate Gilbertson found Plaintiff paranoid and accusatory, and by the third day was so scared that he "begged the guards to move [him] anywhere else" to avoid an altercation, as Plaintiff was like "a ticking time-bomb ready to blow up." (*Id*. at ¶¶ 4-5.) Inmate Gilbertson was then moved to a new cell on April 30, 2015. (*Id*.)

On May 12, 2015, Nicolas Morales was moved into Plaintiff's cell at CSATF. (Morales Decl., Doc. No. 62, at 40-43.) When Inmate Morales first moved in, Plaintiff told him about being stabbed, and Morales understood because the same thing happened to him. (*Id*. at ¶ 2.) Inmate Morales observed that Plaintiff was very anxious, gets angry easily, and cannot control his anger. (*Id*.) Inmate Morales had to stay in his bed most of the time and announce when he would come down or go up, but Plaintiff would still get angry if Morales walked behind or near Plaintiff. (*Id*. at ¶ 3.) On June 11, 2015, Plaintiff and Inmate Morales got into a "huge argument" when Morales walked behind Plaintiff in the cell a couple of times, and Morales thought Plaintiff was going to attack him. (*Id*. at ¶ 4.) Inmate Morales observed that Plaintiff was suspicious of everybody, thinks that people are out to get him, does not trust anyone. (*Id*. at ¶ 5.) Inmate Morales felt scared and very uncomfortable. (*Id*.) Inmate Morales also observed that Plaintiff would not sleep when Morales was in the cell, but instead pretended to be reading and watched Morales. (*Id*. at ¶ 6.) Inmate Morales complained to staff and wanted to move, but they did not believe him. (*Id*. at ¶ 5.)

From September 10, 2015 until October 20, 2015, Plaintiff was celled with Shane Hall at CSATF. (Hall Decl., Doc. No. 62, at 43-45.) Things started off tensely, because Inmate Hall was an ex-skinhead and Plaintiff is mixed race. (*Id*. at ¶ 2.) Inmate Hall found that Plaintiff was on edge from the start, and never relaxed around him, and Plaintiff requested that Hall not walk close to him or get off his bed without telling him. (*Id*. at ¶ 3.) Inmate Hall stayed out of the cell at yard and work all day. (*Id*.) Inmate Hall and Plaintiff got along well during the short periods of the day when he was in the cell, but also had a couple of serious problems. (*Id*. at ¶ 4.) Inmate Hall was

nervous because Plaintiff would not sleep when Hall was in the cell, and would instead watch television or read and watch Hall "like a hawk." (*Id*.) A few times Inmate Hall came back to the cell early while Plaintiff was asleep, and when the door opened, Plaintiff would jump up and rush the door, looking like he was going to swing at Hall. (*Id*. at ¶ 5.)

They also had problems when Inmate Hall would try and use the writing desk in the cell next to Plaintiff's bunk, when Plaintiff would get "in [Hall's] face about walking too close to him. He was visibly shaking and he squared off with me." (*Id*. at ¶ 6.) This incident caused Inmate Hall to want to move out, because he had just gotten a job and would be in the cell more. (*Id*.) Inmate Hall and Plaintiff got along for the most part if Hall stayed on his bunk or out of the cell, but Hall could not continue living in that manner. (*Id*. at ¶ 7.) Inmate Hall therefore moved when he found out that his friend was moving, so that he could move into his friend's cell. (*Id*.) Inmate Hall came too close to fighting with Plaintiff "a bunch of times," so that he felt that he had to move. (*Id*.)

On November 28, 2015, Samir Sweis was "forced to live, move in against [his] will, in a cell with [Plaintiff]" at CSATF. (Sweis Decl., Doc. No. 62, at 46-47, ¶ 1.) Inmate Sweis found Plaintiff very angry, paranoid, and mumbling to himself about a conspiracy, and Sweis was worried for his safety. (*Id*. at ¶ 2.) Plaintiff started telling Inmate Sweis what he could and could not do in the cell, such as not to walk around him and to announce himself. (*Id*.) Inmate Sweis told Plaintiff that he did not plan on staying in his cell, especially given Plaintiff's condition, but he thought that Plaintiff was exaggerating. (*Id*. at ¶ 3.) Inmate Sweis left to the yard to look for a different cell, and came back while Plaintiff was sleeping. (*Id*.) Plaintiff leapt out of bed and rushed at Inmate Sweis, and Sweis tripped over himself and the railing. (*Id*.) Plaintiff then stood over Inmate Sweis and looked like he was going to hit Sweis, so Sweis backed down and told him to calm down. (*Id*.) After a few moments, Plaintiff turned around and went back into the cell, and later apologized. (*Id*. at ¶¶ 3-4.)

Inmate Sweis told the officers that he could not live in the cell with Plaintiff, but they said they could do nothing. (*Id*. at ¶ 4.) Inmate Sweis left his cell as early as he could each day, due to fear of being with Plaintiff, and stayed gone all day, only returning at night. (*Id*. at ¶ 6.) Nevertheless, Plaintiff and Inmate Sweis "almost got[] into it a few times," such as an incident where Plaintiff pushed Inmate Sweis into the wall after Sweis got off his bunk at the head instead of

the front.  (*Id.*)  Plaintiff held Inmate Sweis against the wall, twisted Sweis' hand behind his back, and ranted about a conspiracy, terrifying Sweis.  (*Id.*)  Inmate Sweis declared that he did not want anything to happen with Plaintiff, but the officers do not care about his well-being.  (*Id.* at ¶ 9.)

Recently, from January 16, 2018 until January 27, 2018, Plaintiff was housed at Mule Creek State Prison with Abel Campos.  (Campos Decl., Doc. No. 99, at 106-107.)  Inmate Campos thought that Plaintiff "seemed nice" when they talked in the dayroom, but when Plaintiff came in Campos' cell, he would tell him not to be close to him.  (*Id.*)  Inmate Campos had problems getting out of his bed, and when he mentioned this to Plaintiff, Plaintiff "was tripping and said I wasn't going to be all in his face jumping around his head."  (*Id.*)  When Inmate Campos would use the table to hop down from his bunk, Plaintiff tensed up and got out of bed screaming at Camos, or sometimes socked the cell door or his bed.  (*Id.*)  Plaintiff would pace for a time before he calmed down, and Inmate Campos had to stay on his bed.  (*Id.*)  Plaintiff would stay up all night and all day, and he kept the lights on at night, making it difficult to sleep.  (*Id.*)  Inmate Campos could not do his program because "everything set [Plaintiff] off."  (*Id.*)  Inmate Campos would go to work, the yard, and the dayroom to avoid being in the cell, and Plaintiff's mood swings were too much for Campos to bear.  (*Id.*)  Inmate Campos was upset and scared, and asked if Plaintiff could be put in another cell before they had an altercation.  (*Id.*)

### C.    Analysis

Plaintiff argues that his living condition cause intense distress and create a high likelihood of imminent injury, warranting an injunction that he be housed in a single cell.  "The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) ("After *Winter*, 'plaintiffs must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction."); *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  A preliminary injunction is also appropriate "when a plaintiff demonstrates . . . that serious

questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 97 (9th Cir. 2008) (en banc)). The party seeking the injunction bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009). Finally, an injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

In addition, the Prison Litigation Reform Act ("PLRA") "establishes standards for the entry and termination of prospective relief in civil actions challenging conditions at prison facilities." *Miller v. French*, 530 U.S. 327, 333 (2000). Under the PLRA, a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." 18 U.S.C. § 3626(a)(2).

With these standards in mind, the Court turns to an analysis of the relevant factors based on the arguments and evidence presented here.

### 1. Likelihood of Success on the Merits

In this case, Plaintiff brings claims for deliberate indifference to his health and safety, and for a policy to pressure mental health staff not to recommend single cell housing due to overcrowding, in violation of the Eighth Amendment. Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Serious medical needs include serious mental health needs. *See Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

A supervisory official may be liable for deliberate indifference when the official "implement[s] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir.

2013) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)) (internal quotation marks omitted).

The two-part test for deliberate indifference requires the plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury pain. *McGuckin*, 914 F.2d at 1059 (quoting *Estelle*, 429 U.S. at 104). A condition that a "reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain" are examples of serious medical needs. *Id*. (citing *Wood v. Housewright*, 900 F.2d 1332, 1337–41 (9th Cir. 1990)); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir. 1989).

Here, Plaintiff has presented substantial evidence that he is diagnosed with PTSD resulting from a life-threatening stabbing attack in 2007. Plaintiff has been further diagnosed with serious symptoms from his condition, including severe sleep disturbances and deprivations, avoidance of triggers that presents a significant disturbance in his daily activities, distrust of staff and inmates, hypervigilance, and an extreme startle response. Plaintiff is further diagnosed with Antisocial Personality Disorder. Plaintiff's condition results in extreme anxiety, anxiousness, anger, and avoidance of inmates in staff resulting from his distrust. He was repeatedly noted to have difficulties with interpersonal relationships by staff and his cellmates.

Defendants have not materially disputed Plaintiff's evidence of serious medical and mental health needs. Defendants cite to a note by Defendant Acosta reporting that Plaintiff stated that he staged a fight to up his points to stay on Level III housing. (Defs. Opp'n 8.) The Court does not find that this note undermines the great weight of evidence that Plaintiff has presented of his PTSD diagnosis, severe symptoms, or condition, as found by many medical professionals and diagnostic testing. Defendants also cite to statements by Defendant Grimmig that Plaintiff was possibly feigning symptoms of PTSD to gain single cell status and avoid a dorm setting. (*Id.*) The Court

27

also does not find that this note, in which the basis for Defendant Grimmig's concern of possible feigning is not explained, undermines the significant testing results and other evidence that Plaintiff has presented showing a lack of findings of malingering or symptom exaggeration.

In sum, the Court finds Plaintiff has met his burden to provide evidence showing that he is likely to succeed on the first element of his Eighth Amendment claim, that he has a serious medical need which could cause significant harm if left untreated. The Court next turns to the second element.

Deliberate indifference is shown where the official is aware of a serious medical need and fails to adequately respond. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1018 (9th Cir. 2010). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Farmer*, 511 U.S. at 837. This second prong is satisfied by showing "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). The denial, delay, or intentional inference with treatment, or the way in which care is provided, may show indifference. *Id*. "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Id*.

Neither a difference of opinion between a prisoner and medical authorities regarding treatment, nor a showing a mere difference of medical opinion as to the need to pursue one course of treatment over another is sufficient to establish deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1059–60 (9th Cir. 2004); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). However, the reliance by prison officials upon a second medical opinion which a reasonable person would likely determine to be inferior to one from a more qualified provider may violate the Eight Amendment. *See Hamilton v. Endell*, 981 F.2d 1062, 1066–67 (9th Cir. 1992). To prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the chosen treatment was medically unacceptable under the circumstances, and chosen in conscious disregard of an excessive risk to the plaintiff's health. *Toguchi*, 391 F.3d at 1058.

Failing to provide adequate medical care because of budgetary constraints or non-medical administrative reasons does not excuse deliberate indifference to an inmate's serious medical needs. *See Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986) (finding plaintiff stated claim for deliberate indifference to serious medical needs where he alleged jail officials failed to treat his hernia because of budgetary constraints); *Jett*, 439 F.3d at 1097 (9th Cir. 2006) (finding plaintiff raised triable issue of deliberate indifference when doctor did not arrange follow-up medical care because recommended hospital was not on prison's list of contracting facilities). Additionally, in deciding whether there has been deliberate indifference to an inmate's serious medical needs, the court need not defer to the judgment of prison doctors or administrators. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (citing *Wood v. Sunn*, 852 F.2d 1205, 1211 (9th Cir. 1988)).

Defendants argue that Plaintiff cannot show deliberate indifference with respect to the clinical decisions not to recommend single cell status, and the custodial determination to give a single cell housing assignment, because he has merely shown a difference of opinion and the denial of Plaintiff's housing of choice, to which he is not entitled. Defendants further argue that Plaintiff's policy claim is without support.

Contrary to Defendants' arguments, Plaintiff has presented significant evidence raising serious questions as to the merits of his claims, showing a sufficient likelihood of success given the stage of the litigation and the current request. As detailed above, Plaintiff has presented a plethora of diagnoses by treating psychiatrists, psychologists, physicians, and others that since 2007, he has suffered from severe PTSD symptoms related to his stabbing incident, and extreme fear of being attacked again. There are several, consistent findings recommending single cell status for Plaintiff as part of his treatment for his PTSD, as well as a recognition of serious concerns about the negative effects of Plaintiff's health and well-being due to the denial of single cell housing.

Plaintiff has presented evidence of the effects of multiple different housing attempts on his health and well-being. Plaintiff has also presented declarations that his cellmates over the years found it difficult to impossible to live with Plaintiff given his PTSD symptoms and condition, resulting in numerous altercations and near-altercations. The problem was so serious that custody staff often moved Plaintiff or his cellmates to different cells to avoid significant harm to Plaintiff

1    and others, or housed him alone, even without a current or official single cell housing chrono or

2    recommendation.

3           Plaintiff has also presented evidence that, despite the foregoing, in mental health sessions in

4    2013 with clinical Defendants Kendall and Acosta at California State Prison-Los Angeles County,

5    he was informed that custody staff were directing them to refrain from making single cell housing

6    recommendations due to overcrowding.  (First Am. Compl. ¶¶ 46-48.)

7           Later, in 2014, Plaintiff was transferred to CCI in Tehachapi, California, where he declares

8    that he notified additional clinical Defendants Carrizales, Naficy, Aithal, and Seymour there about

9    his PTSD symptoms and problems living with other inmates, and exhibited his deteriorating

10   condition from double cell housing.  (Id. at ¶¶ 57-58, 60, 62.)  Plaintiff presents evidence that he

11   was met with the same response—that custody staff had instructed mental health staff to refrain

12   from making any recommendations for a need for single cell housing.  (Id.)  Plaintiff was also

13   called into the Defendant Facility Captain Jones's office regarding his complaints to medical staff

14   about his need for single cell housing and he declares that he was informed that such

15   recommendations would not be made by mental health staff.  (Id. at ¶ 59.)  At his first classification

16   hearing at CCI held by Defendants Jones, Guerrero, and Woodard, Plaintiff explained his PTSD

17   condition, his problems and the violence he had experienced from living with cellmates, and his

18   need for single cell status, but his concerns were disregarded, and staff refused to investigate his

19   claims.  (Id. at 61.)  Despite Plaintiff's numerous complaints notifying staff about his cellmate

20   conflicts, none of his cellmates or dormmates have ever been interviewed to evaluate or corroborate

21   Plaintiff's claims.  (Pl.'s 7/31/18 Decl. ¶ 13.)

22          Plaintiff was transferred to CSATF.  (First Am. Compl. ¶ 70.)  Plaintiff presents evidence

23   that he spoke with Defendants Hernandez and Pallares in January 2015 to inform them about his

24   PTSD and need for single cell housing, and was told that Defendant Fisher would not authorize any

25   single cell status.  (Id. at ¶¶ 75-76.)  Plaintiff had later discussions with Defendant Fisher where he

26   asked him to look into his history of cellmate violence to prevent harm, but Fisher declined, stating

27   that he would not approve single cell housing.  (Id. at ¶ 77.)  Additional interviews and

28   conversations through the next several months went the same, despite Plaintiff attempting to submit

declarations from his cellmates directly to staff, including Defendant Miranda. (*Id.* at ¶¶ 78-81.) Plaintiff declares that he was told that it did not matter what he provided, he was never going to get single cell status no matter how many cellmates he had problems with. (*Id.*) Plaintiff was cleared for dormitory housing, and further declares that he was told that his mental health problems were not a concern. (*Id.*) Plaintiff also spoke with Defendant Grimmig about his mental health issues and his need for single cell housing, but Defendant Grimmig refused to make any housing recommendation, stating that custody staff had instructed clinical staff not to because of overcrowding. (*Id.* at ¶¶ 83-85.)

Plaintiff declares that, as he met the same issues at several different CDCR institutions, the matter of denying single cell housing due to overcrowding was policy-based, and the CDCR secretaries at the time of the events at issue, former CDCR Secretaries Beard and Kernan, were responsible for promulgating that policy. (*Id.* at ¶¶ 97-101.) Thus, although Defendants assert that CDCR's written housing policy adequately allows for the input of mental health staff in the housing process, (see Departmental Operations Manual (DOM) §§ 54046.4, 54046.10; Cal. Code Regs., tit. 15, § 3269(a), (f)), Plaintiff asserts that the actual policy as implemented is unconstitutional and caused him, as well as continues to cause him, significant harm.

Plaintiff also submits as evidence a January 19, 2016 Memorandum on Inmate Housing Assignment Considerations During the Screening and Housing Process, issued to Wardens and the Associate Directors of the Division of Adult Institutions by former Secretary Kernan. (1/19/16 Memo., Doc. No. 62, Ex. J, at 137-139.) The memorandum discusses the obligation of staff to consideration the vulnerability of inmates with medical, mental health conditions, or developmental disabilities when determining whether to grant single cell status. (*Id.*) The memorandum discusses that certain conditions may make an inmate particularly vulnerable to attacks or threats from a cellmate, and that an inmate need not demonstrate a history of in cell abuse to be approved for single cell status. (*Id.*) Plaintiff extrapolates from this evidence that the need for clarification by former Secretary Kernan on this matter was due to Defendants and other staff not recognizing that the potential for harm, such as his near-altercations or minor altercations with cell mates, is in certain cases sufficient to warrant single cell status. Thus, former Secretary Kernan had to provide

this clarifying memorandum in 2016 due to years of erroneous denials of single cell housing based on improper standards and due to deliberate indifference.  Further, Plaintiff argues that despite this official memorandum, the policy of denial of single cell status did not change, as shown by his continued difficulties obtaining that status.

In further support of Plaintiff's claim, particularly regarding his policy claim, Plaintiff submits an email chain between clinical psychologist Dr. Zager and Defendant Kendall, in which Dr. Zagler asks, on October 21, 2013, for information on how to locate department regulations so that she can respond to Plaintiff's appeal responses seeking single health status due to his mental health concerns.  (Health Care Appeal Emails, Doc. No. 99, Ex. 14, at 134.)  Rather than providing the requested information, Defendant Kendall responds that the issue was recently discussed at a supervisor's meeting, and Dr. Zagler is instructed to "[n]ote in your response that the decision for single cell status is made by custody and leave it at that."  (*Id*.)  Plaintiff also submits Dr. Zagler's appeal response in which she followed Defendant Kendall's instruction.  (10/23/13 LAC HC 13047307 First Level HC Appeal Response, Doc. No. 99, Ex. 14, at 135.)

Based on the foregoing, the Court finds that Plaintiff presented evidence that non-medical concerns—specifically, a policy to decline single cell housing due to overcrowding—resulted in the denial of single cell housing to Plaintiff, despite evidence showing that single cell housing was strongly recommended PTSD treatment for Plaintiff.  Thus, Plaintiff has met his burden to raise serious questions as to the merits of his claim and a likelihood of success at this stage of the litigation.  Accordingly, the Court finds that Plaintiff has met his burden for the first factor necessary for granting a preliminary injunction.

### 2.    Irreparable Harm

Next, Plaintiff must demonstrate that he is likely to suffer irreparable harm in the absence of an injunction.  Defendants argue that Plaintiff's evidence is mainly his own conclusory opinions, and that his cellmates' declarations offer only speculative evidence of potential harm.  Further, they assert that staff has recently found him capable of housing with other inmates without harm, and rely upon the Costa Declaration and Romano Declaration for these assertions.  Counselor Costa, noting that it is generally common for inmates to seek single cell housing placements so that they do

not have to share a cell, declares that there is no harm to Plaintiff because of a lack of mental health restrictions and because he only has one RVR for fighting. (Costa Decl. ¶¶ 5, 9-10.) Dr. Romano declares that Plaintiff's PTSD alone is not sufficient to warrant single cell housing, that Plaintiff has celled with cellmates without incident, and that although Plaintiff reports PTSD symptoms, Dr. Romano did not personally observe them. (Romano Decl. ¶¶ 6-7.) Dr. Romano also disregarded certain evidence as too old to consider. (*Id.*)

The Court finds Defendants' arguments largely unpersuasive. Rather than simply his own opinion, the Court has set forth above in detail substantial, documented evidence that Plaintiff's PTSD symptoms cause severe mental and physical distress because of double-celling and/or dormitory housing. The evidence includes his fight with Inmate Robison on December 15, 2015 resulting in significant injuries, including a broken bone. Defendants argue that this incident is irrelevant because Plaintiff initially asserted that he was injured in a fall, an argument that is particularly unpersuasive when Plaintiff was found guilty and punished by CDCR for fighting, and the evidence shows that he later admitted to fighting due to his extreme startled response caused by his PTSD, which he initially lied about due to fear of being punished. Regardless, Plaintiff has presented significant other documented evidence of mental and physical harm, including extreme exhaustion and sleep deprivation resulting from living with other cellmates or dormmates, numerous instances of near altercations and altercations, stress and anxiety, hunger strikes leading to substantial weight loss, and other evidence of significant decompensation that increases with time.

Defendants attempt to minimize the cellmate declarations submitted by Plaintiff by arguing that near altercations are evidence that Plaintiff was capable of getting along with cellmates, and that there was only a chance of harm. It also appears that Counselor Costa and Dr. Romano may have ignored this evidence and other evidence in making their declarations explaining their findings.

On the contrary, the Court finds that the inmate declarations portray a serious risk of danger to Plaintiff, staff, and other inmates from a strong potential for violence that was only narrowly averted time and time again, and that sometimes actually resulted in some violent incidents, such as

pushing, hitting, and squaring up to fight. Plaintiff need not show that he will actually be seriously physically injured or killed by a cellmate to demonstrate a likelihood of suffering physical harm; rather, the repeated risk of an altercation with a cellmate is only a part of the picture that Plaintiff has demonstrated. He has also presented evidence of irreparable harm resulting from the medical and mental health injures caused by being double-celled or dormitory-housed rather than single-celled, explained above, in addition to the risk of a violent altercation.

The Court is also cognizant that the harm Plaintiff has presented evidence of is not merely financial, but rather a significant risk of mental and physical harm, as well as the violation of his constitutional rights, which "cannot be adequately remedied through damages." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009) (finding plaintiffs would suffer irreparable harm if preliminary injunction were denied and defendants violated their constitutional rights).

Accordingly, the Court finds that Plaintiff has demonstrated that he is likely to suffer irreparable harm in the absence of injunctive relief.

### 3. Balance of Equities/Hardships

Third, Plaintiff must show that the balance of hardships tips in his favor. Defendants argue that there is harm caused by the implications of the Court interceding in CDCR's housing determinations and requiring institutions to provide prisoners with the housing of their choice, and by the courts interfering with the administration of the safety and security of prisons.

The Court finds that the matters raised by Defendants are more properly addressed in considering the scope of the preliminary injunctive relief to be issued here, if any, and therefore addresses those arguments more below. As regards the balance of hardships, Plaintiff has demonstrated that he is likely to suffer irreparable harm to his psychological and physical health if he is double-celled or put into dormitory housing. By contrast, putting aside the important policy considerations that the Court discusses below, Defendants have not presented any evidence of specific hardships that would be caused by housing Plaintiff in a single cell. Accordingly, the Court finds that the balance of hardships tips sharply in Plaintiff's favor.

///

///

34

### 4. Public Interest

Fourth, Plaintiff must demonstrate that an injunction is in the public interest. Defendants raise similar policy arguments that are noted above, concerning the public interest in a court not interfering with prison officials' administration of the safety and security of a prison. The Court takes these concerns very seriously, but also finds that these matters are more properly raised in considering the scope of preliminary injunctive relief, addressed below.

Here, the Court finds that the provision of constitutionally adequate care for medically and mentally ill prisoners, under the circumstances demonstrated by Plaintiff's evidence, is clearly is in the public interest. *See, e.g.*, *Mayweathers v. Newland*, 258 F.3d 930, 938 (9th Cir.2001) (finding protection of inmates' religious rights is in the public interest); *Rouser v. White*, 707 F.Supp.2d 1055, 1071 (E.D.Cal. 2010) (accord). Accordingly, Plaintiff has met the public interest factor of the test for preliminary injunctive relief in this case.

For the reasons discussed above, the Court finds that Plaintiff has met his burden to demonstrate all four elements necessary to prevail on a request for preliminary injunctive relief. Next, the Court turns to the proper scope of relief in this case.

### C. Scope of Preliminary Injunction

A preliminary injunction in a case brought by a prisoner "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The function of a preliminary injunction is to preserve the status quo *ante litem*. *Regents of University of California v. American Broadcasting Companies, Inc.*, 74 F.2d 511, 514 (9th Cir. 1984). "The status quo *ante litem* refers not simply to any situation before the filing of a lawsuit, but instead to 'the last, uncontested status which preceded the pending controversy.'" *GOTO.COM, Inc. v. Walt Disney Company*, 202 F.3d 1199, 1210 (9th Cir. 2000) (internal quotation and citation omitted).

Further, the Supreme Court has repeatedly held that courts must accord substantial deference to prison officials in the administration of matters dealing with the safety and security of their institutions, staff, and prisoners. *See Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (prison administrators are entitled to "wide-ranging deference in the adoption and execution of policies and

practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"); *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a correctional system and for determining the most appropriate means to accomplish them."); *Norwood v. Vance*, 591 F.3d 1062, 1066-67 (9th Cir. 2009) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)) ("deference requires 'that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice'")).

Housing assignments for prisoners in the custody of CDCR are governed by California regulations. Cal. Code. Regs. tit. 15, § 3269. They are "determined in a manner that will ensure the safety, security, treatment, and rehabilitative needs of the inmate are considered, as well as the safety and security of the public, staff, and institutions." Cal. Code. Regs. tit. 15, § 3269.1. As noted above, the DOM and Title 15 discuss mental health factors to be considered in determining an inmate's housing placement, which are just some of the considerations that go into the decision. In the DOM § 54046.4, "Review of Inmate's Case Factors," one of the factors the approving authority shall consider is "vulnerability of the inmate due to medical, mental health, and disabilities."

DOM § 54046.10, "Recommendation for Double Cell or Single Cell Due to Mental Health Concerns," specifically discusses recommendations for double cell or single cell due to mental health concerns, and states that the classification committee shall consider clinical recommendations. Section 3269 in Title 15, "Inmate Housing Assignments," lists factors for the screening authority to consider when assigning housing. While an inmate's mental health is not a factor listed in subdivision (a), that list is not exhaustive, and subdivision (f) explicitly addresses single-cell status recommendations by mental health staff, and states that the classification committee shall consider those recommendations. Cal. Code Regs., tit. 15, § 3269(a), (f).

Thus, housing determinations for prisoners in the custody of CDCR are complex decisions peculiarly within the province of expert prison officials, involving a multitude of factors. The Court cannot, particularly at this stage, order that Plaintiff be required to be housed a single cell, as this would be beyond the narrowly-drawn relief that the Court is limited to grant in this case.

Furthermore, the pendency of this action does not give the Court jurisdiction over prison officials in general. *Summers v. Earth Island Inst.*, 555 U.S. 488, 491−93 (2009); *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010). The Court's jurisdiction is limited to the parties in this action and to the viable legal claims upon which this action is proceeding. *Summers*, 555 U.S. at 491−93; *Mayfield*, 599 F.3d at 969. As the evidence presented shows that a UCC panel at Plaintiff's current institution are responsible for determining Plaintiff's housing assignment, who are not parties here, the Court does not have jurisdiction to order the relief that Plaintiff seeks.

However, the Court finds that Plaintiff is entitled to limited preliminary injunctive relief based upon the circumstances here and his demonstration of the required elements. The Costa Declaration discusses that at Plaintiff's January 4, 2018 UCC hearing, Plaintiff's central file contained no notation of current case factors precluding double cell or dorm housing, IDTTs that had no noted mental health restrictions regarding Plaintiff's housing and no recommendation of single cell status, and his central file contained no documented history of significant in-cell abuse, violence towards a cell partner, or in-cell victimization concerns. (Costa Decl. ¶ 9.) These factors were relevant to Plaintiff's housing determination and the decision to approve him for double cell housing. (*Id.*)

The January 19, 2016 Memorandum by former Secretary Kernan discusses that factors which should be weighed in determining a prisoner's housing assignment should include vulnerability due to medical and mental health, and that it is not necessary for an inmate to demonstrate a history of in-cell abuse to be approved for single cell status. (1/19/16 Memo at 137.) It does not appear that the policy in the January 19, 2016 Memorandum is being fully followed with respect to Plaintiff, as the Costa Declaration reflects that his records do not contain the evidence outlined above of his documented vulnerability based on his condition.

Accordingly, the Court finds that the CDCR policy should be properly interpreted and enforced here. Plaintiff's central file should contain documentation showing Plaintiff's PTSD diagnosis, his history of in-cell near incidents of violence, and a recent medical recommendation regarding his need for single cell housing, all of which are thoroughly contained in the McCall Report. The Court therefore recommends that Plaintiff's motion for preliminary injunctive relief be

granted, such that Defendants be required to update Plaintiff's central file with a copy of the McCall Report, for consideration in any future housing assignment determinations.

Moreover, if custody staff refuse to house Plaintiff in a single cell, Plaintiff is not precluded from amending his First Amended Complaint in this action to add as defendants any custody staff with the authority to place him in a single cell, and renewing his request for a preliminary injunction against those defendants, if he fails to obtain the relief he seeks after exhausting his administrative remedies.

## V.    Conclusion, Order, and Recommendation

For the reasons explained, the Court HEREBY ORDERS that:

1.      Plaintiff's motions for an extension of time to file a reply, filed on May 29, 2018 (Doc. No. 86), and on June 20, 2018, (Doc No. 91), are granted, to the extent discussed above;

2.      Defendants' motion to strike evidence that Plaintiff filed in support of his reply to Defendant's opposition, filed on August 17, 2018, (Doc. No. 100), is denied;

3.      Plaintiff's motion to file documents under seal, filed on August 27, 2018 (Doc. No. 102), is granted;

4.      Pursuant to Local Rule 141(e)(2)(ii), the Court will transmit to the Clerk of the Court Plaintiff's documents to be sealed, along with this order authorizing sealing.  The Clerk will scan the documents to be sealed and file them under seal.  The Clerk will then return the documents to Plaintiff, the submitting party; and

5.      Plaintiff's emergency motion for immediate resolution of his motion for preliminary injunction, filed on November 14, 2018 (Doc. No. 110) is denied, as unnecessary.

***

Further, the Court HEREBY RECOMMENDS that Plaintiff's motion for a preliminary injunction (Doc. No. 62) be granted in part, as described above.  Specifically, the Court recommends that Defendants be required to update Plaintiff's central file with the McCall Report, for consideration in any future housing assignment determinations.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, under 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with

38

these Findings and Recommendations, the parties may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: __**November 30, 2018**__ _____ /s/ *Barbara A. McAuliffe* _____
                                                            UNITED STATES MAGISTRATE JUDGE